HAELAN LABORATORIES, Inc. v.
TOPPS CHEWING GUM CO.

Civ. No. 11852.

United States District Court
E. D. New York.

May 25, 1953.

Jonas J. Shapiro, New York City, for plaintiff.

Pennie, Edmonds, Morton, Barrow & Taylor, New York City, George E. Middleton, New York City, of counsel, for defendant.

GALSTON, District Judge.

In determining the respective rights of the parties to exclusive use of the names, pictures and biographical sketches of the baseball players, the Court must consider the terms and the validity of as many as six separate contracts for many of the players. There are involved here the contract rights in respect to over five hundred players, requiring examination of contracts numbering in the thousands. The conduct of each party in soliciting a particular player, or in using his name or picture, is also material. The time and labor involved in determining the rights in issue on these motions have been so considerable that for final hearing on these issues, and that of damages, the aid of a master to be appointed will doubtless be called for. The contracts involving the five hundred players, or more, present as to each player in effect a cause of action in itself.

The parties, recognizing the complexities involved, have chosen to limit the bases upon which they seek temporary injunctions on this hearing; e. g. for the time being the plaintiff is not raising any issue in respect to the validity of the Russell contracts. On the defendant's part, it has not placed the new contracts, except for renewal, obtained with players subsequent to the trial in evidence on this hearing.

In supporting its motion for a temporary injunction restraining the defendant from seeking to obtain the licenses to the names, pictures or biographical sketches of baseball players alleged to be under exclusive contract to it for 1953, the plaintiff has separated the players into various categories, based upon different factors which the plaintiff believes justify the Court in granting the injunction. As a general classification, the players may be separated into those with whom the plaintiff had exclusive contracts for 1953 at the time of the trial, as shown in Exhibits 29 and 29–A, and those with whom the plaintiff obtained contracts subsequent to the trial.

In view of the decision of the Court of Appeals that either party here could obtain exclusive grants of the right of publicity of players' names, pictures and biographical sketches, the fact that one party's contracts pre-date the contracts upon which the other party relies, should be sufficient of itself to entitle the party with

the earlier contracts to an injunction. The plaintiff relies upon this aspect of the Court's decision in claiming the right to an injunction to some two hundred players from among the four hundred odd players appearing in Exhibits 29 and 29–A. It has renewed its contracts with these players for the year 1953. On its part, the defendant makes no claim to having any conflicting exclusive rights for 1953 with any of these two hundred players.

Miss Joan Crosby testified at the hearing on these motions that the plaintiff did not exercise its option to renew contracts with eight of the players who have been included by the plaintiff in the above group. These players are Ray Blades, Vernal L. Jones, Terry Moore, Tom Poholsky, Joe Presko, Mike Ryba, Bill Sarni and Clyde Wares. The plaintiff, however, is entitled to an injunction in respect to the remaining players in this first group. The names of the players are embodied in finding No. 7.

Conrado Marerro may also be placed in this group. Schedule A, attached to the Shorin affidavit, in support of the defendant's motion for a temporary injunction, lists Marerro as one of the players with whom the defendant signed a new contract as distinguished from those players renewing previous Players Enterprises contracts. In its brief, the defendant states that its exclusive right to players who signed new contracts "will be temporarily disregarded" on these motions. As noted, these new contracts are not in evidence. As a consequence, it may be concluded that the defendant does not challenge the plaintiff's prior rights to this player at this time.

Two players, Lumin Harris and Wally Moses, are treated together by the plaintiff. It claims exclusive contracts with the two players pre-dating the Players Enterprises contracts under which the defendant asserts conflicting rights for 1953. The plaintiff's contract with Harris for the years 1952 to 1956 inclusive, is dated May 18, 1951, while the earliest Players Enterprises contract with this player, effective through October 31, 1952, with an option to renew, is dated May 24, 1951. The plaintiff's contract for the years 1952 to 1956 with Moses is dated May 22, 1951, while the Players Enterprises contract with the player, effective through October 31, 1952, with an option to renew, is dated May 12, 1951. However, the plaintiff had a contract dated March 17, 1951 with Moses for the year 1951, with an option to renew for 1952.

The plaintiff's prior rights to Harris are undisputed by the defendant. There is, however, opposition in respect to Moses.

From the record, the defendant does not have an exclusive contract with either Harris or Moses for the year 1953. The evidence also indicates that it is not using, nor does it intend to use, either player in its 1953 card series.

In respect to the remaining players appearing in Exhibits 29 and 29–A as to whom the plaintiff seeks an injunction, it has chosen to base its claim to exclusive rights for 1953 on the additional ground of the Court of Appeals decision that use by one party, with knowledge of prior conflicting rights, constitutes a tort which makes the tortfeasor's alleged rights "illegal" and invalid.

As to the majority of these players, the defendant does not claim to have exclusive contracts for 1953. It contends, however, that the plaintiff's contracts with these players were executed subsequently to earlier contracts signed by them with Russell Publishing Company or with Players Enterprises. The use of these players by the plaintiff during 1952, it is argued, resulted in each of plaintiff's contracts being "tainted with illegality" and "utterly invalid" under the decision of the Court of Appeals. 2 Cir., 202 F.2d 866, 869. Thus the parties, in supporting and in opposing the plaintiff's claim to an injunction as to these players, rely on the same legal grounds.

The instructions of the Court of Appeals on remand require a determination (at least on final hearing) of the following facts:

"1. The date and contents of *each* of plaintiff's contracts, and whether plaintiff exercised its option to renew;

"2. Defendant's or Players' conduct with respect to *each* such contract;

"3. The date and contents of *each* of defendant's contracts under which defendant claims, and whether defendant exercised its option to renew; and

"4. Plaintiff's conduct with respect to *each* such contract." (Emphasis added.)

These instructions make it clear that the "knowledge" the Court had in mind was the defendant's or plaintiff's knowledge, if any, of the plaintiff's or defendant's contract rights as to each particular player, rather than the knowledge on its part that the plaintiff or defendant had contracts with players *generally*. The following statement of the Court, made in respect to the Russell contracts, further bears this out:

"* * * plaintiff, in its capacity as exclusive grantee of *a player's* 'right of publicity,' has a valid claim against defendant if defendant used *that player's* photograph during the term of plaintiff's grant and with knowledge of it." (Emphasis added.)

There is also the following in the Court's supplemental opinion:

"The last sentence under point 2 of our opinion might suggest that, as long as one of the parties had a contract with *a ball-player* giving it exclusive rights, any subsequent contract made between *that player* and the other party before expiration of the prior rights is necessarily invalid. * * * Where the party soliciting such a subsequent contract *knows* of the prior rights and actually proceeds *to use* the grant given in violation thereof, its contract is tainted with illegality and is utterly invalid. * * * Hence such a contract would convey no rights even if it ran beyond the duration of the other party's prior rights." (Emphasis added.)

There is evidence that the defendant, through its president, Shorin, was aware of plaintiff's baseball picture card gum in 1948. The evidence does not show, however, that this general awareness included knowledge that particular players had actually signed contracts with Bowman Gum. If this were all the evidence in the way of knowledge in the defendant of the plaintiff's prior rights, the plaintiff would not be

entitled to an injunction as to any of the remaining players in Exhibits 29 and 29–A. However, in respect to many of the players, the negative covenant in the New Players Enterprises contracts excepted "the rights given under existing contracts with Bowman Gum" from the exclusive grant given. This exception must be interpreted as knowledge or constituted notice to the grantee of the existence of prior rights in Bowman Gum. It raised at least a duty in the grantee to make the necessary inquiries to try to ascertain the extent of these rights. The evidence fails to disclose any attempt on defendant's part to make an effort to determine the nature of the rights under these "Bowman Gum" exceptions. In this connection it may be noted that the Court of Appeals in its opinion stated as follows:

"Since Players acted as defendant's agent, defendant is liable for any breach of plaintiff's contracts thus induced by Players."

A number of these players with Bowman Gum exceptions were used, as shown in Exhibit 60, by the defendant in its 1951 baseball card candy series. An examination of the various contracts discloses the fact that in many instances the earliest Russell or Players Enterprises contract with the player was executed at a later date than the player's contract with Bowman for 1951. The exclusive rights granted in the 1951 Bowman Gum contract included an agreement by the player to grant similar rights to "no other manufacturer of chewing gum or confections."

The actual notice of rights in Bowman Gum under existing contracts appearing in the New Players Enterprises contracts, and the failure of the defendant to make inquiries to avoid conflicts with any prior rights, require the conclusion that the defendant used the grant given it with knowledge of prior existing rights. As the evidence indicates that the plaintiff has a grant for 1953, it is entitled to an injunction as to the players named in finding No. 12 on the ground that the defendant's use of their names and pictures in 1951 was an "illegal" use.

It is noted that the Players Enterprises contracts contain a provision wherein

the player agrees not to renew any contracts with other parties. Even assuming, as a general principle, that this provision is valid and enforceable, the fact that the defendant interfered with the plaintiff's prior rights rendered it unenforceable in the circumstances considered above.

These same circumstances constitute the ground for granting an injunction in the case of Wally Moses, who was mentioned earlier. His New Players Enterprises contract contains a Bowman Gum exception, and his name and picture were used by the defendant in 1952. Such use constituted an interference with the 1951 Bowman contract, so that the defendant cannot invoke any enforceable rights under the Players Enterprises contract of May 12, 1951.

Similar circumstances entitle the plaintiff to an injunction in respect to Gerry Coleman. In a letter, dated April 17, 1951, plaintiff's counsel notified the defendant that the plaintiff claimed prior rights to the use of Coleman's name and picture. Apparently the rights asserted by the plaintiff were those based upon its contract for 1951 with option rights for 1952. The plaintiff's 1951 contract with Coleman is dated August 23, 1950, while that of Players Enterprise is dated August 31, 1950 and the Russell contract is dated October 2, 1950 Therefore, the defendant's use of Coleman's name and picture in its 1951 series constituted interference with knowledge of prior rights, making the defendant's rights invalid under the Court of Appeals decision. Some other players were also named in the April 17 letter, but the Players Enterprises contracts upon which the defendant bases its rights seem to ante-date the plaintiff's contracts for 1951 as to them.

The defendant used other players in its 1951 series whose New Players Enterprises contracts also excepted Bowman Gum from the grant given. They include the following players:

| | |
|---|---|
| Robert Feller | Henry Sauer |
| John Groth | Warren Spahn |
| Jim Hegan | William Werle |
| Gene Hermanski | Al Zarilla |
| Sid Hudson | Gus Zernial |
| Tom Galviano | Ray Scarborough |

As to these players, however, their earliest Russell or Players Enterprises contract pre-dates their 1951 Bowman Gum contract. The plaintiff points to the fact that it had contracts with these players pre-dating the Players Enterprises contracts, giving it rights for 1950 with an option to renew for 1951, which it has exercised. There is, however, a significant difference in the 1950 and the 1951 contracts of the plaintiff. The 1951 contracts are the first Bowman Gum contracts to include "confections" in the clause restricting the player from making similar grants for other products. In the earlier 1950 Bowman contracts, the clause under which the player agreed to withhold permission to use his name and picture was limited to "no other manufacturer of chewing gum."

In 1951, the defendant manufactured toy and candy products as well as chewing gum. Its 1951 baseball card series was put out with a candy product and not with gum. The clause "no other manufacturer of chewing gum" found in the Bowman contracts for the year 1951, by its terms covers the defendant. However, from the language of the grant, it is reasonable to assume that what was intended by the parties to the contract was to withhold the use of the player's name and picture with competing gum products; for example, the clause granting the exclusive "publicity rights" states that it is for "the advertising, promotion and sale of its chewing gum products", while the negative covenant is an agreement by the player to grant no other manufacturer of chewing gum "the above mentioned permission, rights, privileges or any of them", reference being to "chewing gum products".

The plaintiff contends that nevertheless the defendant's use of these players in 1952 constituted conduct which made the defendant's contract rights invalid. In the case of John Groth, there is a Russell contract, dated October 2, 1950, for one year with an option to renew for an additional year, to be exercised by the grantee giving written notice to the player. The evidence fails to show that the option was exercised. There is no Old Players Enterprises contract with Groth in evidence. His New

Players Enterprises contract is not dated. The earliest New Players Enterprises contract was executed on May 2, 1951. It is reasonable to assume from this that Groth's contract was executed not earlier than May 2, 1951. Consequently, but for the New Players Enterprises contract, the defendant's right to use Groth would have expired on October 2, 1951. At the time of the New Players Enterprises contract, however, there already was in existence a Bowman contract, dated March 9, 1951, for 1951 with an option for 1952. Upon the failure to renew the Russell contract, the Bowman contract for 1951 became prior in time and in rights. In using Groth's name, etc., in 1952, in reliance on the New Players Enterprises contract that indicated the existence of prior rights in Bowman, the defendant interfered with such prior rights, making its rights invalid. The plaintiff's use in 1951 did not interfere with the Russell contracts rights, since plaintiff's earlier contract for 1950 contained an option for 1951. Its use in 1952 was not an interference with the Russell contract rights either, as the Russell contract had expired in October 1951. Therefore, the plaintiff is entitled to an injunction in respect to John Groth.

The status of Robert Feller is similar to that of Groth. Feller's Russell contract, dated June 15, 1950, is earlier than his Bowman contract for 1951, dated August 29, 1950. His Russell contract was not renewed, however, and his Bowman contract for 1951 pre-dates the Old Players Enterprises contract of August 31, 1950.

■ The remaining ten players in the foregoing group have executed Old Players Enterprises contracts pre-dating their 1951 Bowman Gum contracts. As of the date of these Old Players Enterprises contracts, entered into between July and September, 1950, the contract rights of Bowman, as evidenced by its 1950 contracts, extended only through 1951. Consequently the defendant was not interfering with any prior rights in using these players in 1952.

The plaintiff points to the fact that the players have not received $250 in royalties before May 1, 1951, as guaranteed by the Old Players Enterprises contracts, and contends that the contracts have therefore lapsed. The evidence fails to show, however, that the players in question ever regarded their contracts as having lapsed because of the failure to receive a minimum of $250 in royalties. In fact, the players subsequently signed the New Players Enterprises contracts, in 1951, containing the following significant paragraph:

"5. This agreement shall supplement any prior agreements the Player may have with Russell Publishing Company or the Corporation without diminishing the rights of Russell Publishing Company or the Corporation thereunder, but the Player hereby releases the said corporations from any liability to him under such prior agreements. Any advance royalties received by the Player under such prior agreements shall be deemed advance royalties under this agreement."

The language of this paragraph indicates that the player is releasing Players Enterprises from the royalty guarantee clause contained in the Old Players Enterprises contract. Moreover it entitles Players Enterprises to apply any "advance royalties" paid under the Old Players Enterprises contracts towards satisfaction of the requirement of the payment of the $100 minimum for renewing the contracts of the Players Enterprises with the player. Under the present showing, therefore, the plaintiff is not entitled to an injunction with respect to these ten players.

Another group of players who inserted a Bowman Gum exception in their New Players Enterprises contracts, although not used by the defendant in its 1951 candy series, was used by it in its 1952 baseball card bubble gum series. The evidence discloses that the earliest contracts upon which the defendant relies as to some of these players is the New Players Enterprises contracts, executed not earlier than May 2, 1951. At that time these players had already made Bowman contracts for 1951 with an option to renew for 1952, executed not later than March, 1951. In view of the notice of prior rights expressly written into the New Players Enterprises contracts, the plaintiff is entitled to an injunction as to these players as listed in finding No. 13.

Al Widmar can also be included in this group. Although he also signed a Russell contract, dated October 2, 1950, this contract was not renewed. Thus the rights obtained under the 1951 Bowman contract, dated March 3, 1951, are prior to the rights obtained under the May 16, 1951 New Players Enterprises contract.

Among the players who inserted Bowman Gum exceptions in their New Players Enterprises contracts, and who were used by the defendant in 1952, some players had Russell contracts, but no Old Players Enterprises contracts. In many instances the 1951 Bowman contract, with the right of renewal for 1952, pre-date their Russell contracts. Consequently the plaintiff is entitled to injunctive relief as to the players whose contracts come within this classification. They are embodied in finding No. 14.

Cliff Mapes and Irv Noren may also be included in this group. Although their Russell contracts pre-date their 1951 Bowman contracts, the Russell contracts were not renewed for 1952, and both the 1951 and the 1952 Bowman contracts antedate their New Players Enterprises contracts.

The plaintiff also claims the right to exclusive use in 1953 as to Max Lanier, Harry Lowrey and Stanley Rojek. Miss Crosby testified, however, that plaintiff has not renewed their 1953 contracts. Therefore there is no right to an injunction in plaintiff's favor as to these players.

There is also a group of players whose Russell contracts contain a notation that, on the basis of the terms of the contract or from the testimony of Rensel who solicited these contracts, they must be construed as excepting Bowman Gum from the exclusive grant given. Their names will be found in finding No. 17. In the case of Doby, his Russell contract pre-dates the Bowman contract for 1951, with option rights for 1952. "Bowman Gum" is a pencil notation placed at the foot of Doby's Russell contract. In view of the fact that the plaintiff had no exclusive right to the use of Doby's name and picture for 1952, as of October 2, 1950, the date of the Russell contract, it cannot be said that the defendant's use of his name and picture in 1952 constituted an interference with prior rights. If the Bowman Gum exception in the contract could be construed as excepting chewing gum products generally from the grant given in the Russell contract, the defendant's use in 1952 would not be supported by the terms of the contract. So far as can be determined from the evidence, however, all that can be stated for certain is that the Bowman Gum exception in the Russell contract enables the plaintiff to obtain equal rights to the use of Doby's name and picture. The fact that the earlier Russell contract provided for an exclusive grant would not preclude the plaintiff from obtaining the use of his name and picture, as the clause granting exclusive rights reads as follows:

"I further agree (except as listed above), that the right of Russell Publishing Company * * * shall be exclusive, and that I will not grant permission to use my name or picture in the manner described above to anyone except (as listed above) * * *."

The above clause is in contrast to the negative covenant appearing in the Players Enterprises contracts as follows:

"(except the rights given under existing contracts with        )"

Thus the exception in the Russell contracts is not limited necessarily to rights under existing contracts, but may extend to prospective contracts as well. It must be concluded, therefore, that as to Doby the rights of the parties to the use of his name and picture are co-equal, and the plaintiff is not entitled to an injunction on the ground of interference with the plaintiff's prior rights in 1952.

Herman Wehmeier's Russell contract also excepts Bowman Gum from the grant given. However, there is an Old Players Enterprises contract with him which pre-dates both the Russell and the 1951 Bowman contracts. Therefore, although the defendant cannot base any rights on the Russell contract superior to plaintiff's rights, the Old Players Enterprises contract sustains its use of this player in 1951 and 1952.

The evidence on the present record entitles the plaintiff to an injunction as to the

players indicated. It has obtained contract rights for 1953 with all of them. As to the remaining players named in Exhibits 29 and 29–A for whom the plaintiff seeks an injunction, it must be concluded that it has failed to show knowledge in the defendant of the plaintiff's prior rights which will sustain its claim under the decision of the Court of Appeals.

The plaintiff also seeks temporary injunctions as to additional players with whom it has executed exclusive contracts for 1953, and following years, subsequent to the trial. These players are listed in Exhibit 33 and in a stipulation entered into between the parties, dated April 20, 1953. Miss Crosby testified that new contracts were made by the plaintiff with Al Aber on April 2, 1953, and with Jim Lemon on April 6, 1953, and the plaintiff claims exclusive rights for 1953 with these players.

It now appears that the plaintiff no longer seeks injunctions as to certain of these players, having determined, that Players Enterprises contracts with them predated its contracts. The plaintiff has listed the following players: Joseph Black, Samuel F. Calderone, Edward Ford, William Hoeft, Clem Labine, Stuart Miller and Wilmer Mizell.

The stipulation of April 20, 1953 includes names of players appearing on Exhibits 29 and 29–A whose contracts with Bowman extended only through 1952 with an option to renew for 1953. The dates of the renewal for 1953 of these players' contracts has been stipulated by the parties. Of the players named in paragraph 1(a) of the stipulation, the defendant raises objection to but two players, viz. Seminick and Sauer. These two players' status has been considered.

Paragraph 2(a) of the stipulation also lists a number of players appearing in Exhibit 29 and 29–A. All but two of these players have already been discussed previously herein. Cloyd Boyer and Clifford Chambers remain for consideration. Neither player has a Bowman Gum exception in his New Players Enterprises contract. Both players were used by the defendant in its 1952 series. Boyer's earliest contract with either Russell or Players Enterprises

is dated May 4, 1951. Since his Bowman Gum contract for 1951 is dated March 10, 1951, the plaintiff's prior right to his name and picture is clearly established. Chambers is among those players as to whom the plaintiff contends that use by the defendant in either 1951 or 1952 constituted an "illegal" interference with the plaintiff's prior rights. The evidence indicates, however, that his Old Players Enterprises contract, dated August 2, 1950, pre-dates his Bowman contract for 1951. Moreover, the evidence fails to establish that the defendant had knowledge of conflicting prior rights, if any, in the plaintiff when the defendant used the player in 1951 or 1952. Therefore, the plaintiff's right to an injunction as to Chambers has not been established.

Exhibit 33 contains the names of players with whom the plaintiff obtained new contracts following the trial and who do not appear on Exhibits 29 and 29–A. The defendant contends that these players should not be considered on this hearing as the plaintiff's motion for a temporary injunction is directed only to the players appearing on Exhibits 29 and 29–A. However, it was clearly intimated during the hearing on these motions that both sides would prefer to have the whole matter disposed of, and that the pleadings and motions would be amended to conform to the proof offered.

There is no other opposition to the plaintiff's claim to exclusive rights for 1953 to the players contained in Exhibit 33.

Now as to defendant's motion for a temporary injunction as to certain players with whom it claims exclusive rights for 1953:

The list it has submitted is made up of players whose Players Enterprises contracts have been renewed and of players who have signed new exclusive contracts subsequent to the trial. The new contracts, as distinguished from the renewals, have not been put into evidence on this hearing. Consequently, the right, if any, of the defendant to an injunction as to these players need not be considered at this time.

The names of players claimed by the defendant on the basis of the renewal of their Players Enterprises contracts are listed in

Schedule A, attached to the Shorin affidavit, and are identified by asterisks before their names. These players may be divided into those for whom the plaintiff also seeks injunctive relief for 1953 and those for whom the plaintiff does not seek any injunction. The following sixteen players fall within the second category:

Ray Boone
Joe Collins
Ferris R. Fain
Grady Hatton
William Howerton
Monford Irvin
Bob Kennedy
Dale Mitchell
Dave Philley
Howard J. Pollett
Connie Ryan
Roy E. Sievers
Charles K. Stobbs
Wayne Terwilliger
Paul H. Trout
Elmer W. Valo

Among the latter players, Ferris Fain is the only one in respect to whom the plaintiff has expressed no specific opposition. The evidence does not disclose any Bowman contract with Fain for 1953.

█ The Players Enterprises contracts with Monte Irvin, Bob Kennedy and Charles Stobbs appear to pre-date any of plaintiff's contracts. Plaintiff has never had a contract with Stobbs. The first contract made by plaintiff with Kennedy is dated May 17, 1951, for the year 1951 with an option for 1952. Kennedy's Old Players Enterprises contract is dated August 10, 1950. The defendant also obtained a New Players Enterprises contract with Kennedy on May 21, 1951. This was four days after the player signed a contract with Bowman on May 17, 1951, for the year 1951 with an option for 1952. However, the defendant's rights must be regarded as extending back to August, 1950 under the Old Players Enterprises contract.

The plaintiff contends that the defendant's attempt to renew for 1953, as evidenced by the letter of August 16, 1952, was ineffective because there was no payment of the required minimum royalties. The earlier discussion relating to Hermanski et al. is pertinent here, and shows that the defendant considered its rights in the light of all its then existing contracts with the player, taken together as integrated parts of one bundle of rights. Whether it is proper to characterize the manner in which Players Enterprises worded the New Players Enterprises contracts as "clever" or as "careful", there is no present showing that the player was wrongfully induced into signing.

Irvin's Old Players Enterprises contract also pre-dates any Bowman contracts with him. The plaintiff contends that the defendant's use of Irvin's picture and name in 1951 interfered with the rights granted under the Bowman contract, dated March 20, 1951, thus rendering the defendant's contract rights invalid. However, in comparing contracts the plaintiff refers to the New Players Enterprises contract of May 26, 1951 rather than to the Old Players Enterprises contract of August 11, 1950.

The defendant's rights as to Grady Hatton, Dave Philley, Howard Pollett, Roy Sievers, Wayne Terwilliger and Paul Trout, as based upon priority of contracts alone, are not so clear-cut. However, the plaintiff does not contend that the defendant interfered with any of the plaintiff's prior rights under earlier contracts with these players. Moreover, it does not appear to have contracts for 1953 with these players. The plaintiff does, however, dispute the validity of the renewals for 1953 obtained by Players Enterprises, on the ground that the failure to pay minimum royalties precluded any renewals. Hatton, Pollett, Sievers and Terwilliger are in the same position as Hermanski and Kennedy on this point, and the earlier discussion as to those players is equally applicable here. As to Philley and Trout, the plaintiff's opposition is based upon a distinction it makes between the actual payments to the players and "earned" royalties. This distinction does not appear called for under the Players Enterprises contracts. The players certainly were paid $100 under their contracts, and neither player has made

any protest so far as the record shows that he is entitled to any additional payments as royalties.

In view of the foregoing, therefore; the defendant is entitled to a temporary injunction in respect to all the above players.

There remains for consideration the rights in respect to Ray Boone, Joe Collins, Bill Howerton, Dale Mitchell, Connie Ryan and Elmer Valo of the group as to whom the plaintiff does not seek an injunction. The distinguishing fact in respect to these players is that the plaintiff appears to have contracts for 1953 but is not claiming exclusive rights to their names and pictures at this time. Except for Dale Mitchell, the grounds for the plaintiff's opposition to the defendant's claim to injunctions are the same as those set forth with respect to Hatton et al., and the conclusions reached there are applicable here.

Mitchell's contract with the plaintiff for 1951 is dated August 29, 1950. His Old Players Enterprises contract is dated September 3, 1950. On May 21, 1951 he executed a New Players Enterprises contract, excepting Bowman Gum from the exclusive grant given thereunder. The actual notice thus given of existing rights in the plaintiff makes the use of Mitchell's name and picture in 1951 illegal. Therefore, the defendant is not entitled to rely on its contract rights with him for 1953.

There are twenty-six players on the list attached to the Shorin affidavit as to whom both parties claim exclusive contract rights for 1953. They are:
Gus Bell
Robert Feller
Howard Fox
Mike Garcia
Sid Gordon
Tom Galviano
Jim Hegan
Gene Hermanski
Theodore Kluszewski
Maurice McDermott
Edward Miksis
Andy Seminick
Henry Sauer
Mel Parnell
Allie Reynolds
Albert Rosen
Ray Scarborough
Warren E. Spahn
Virgil Stallcup
Henry Thompson
Herman Wehmeier
William G. Werle
Early Wynn
John W. Wyrostek
Al Zarilla
Gus Zernial

In determining the conflicting claims it is not enough to examine the most recent contracts or renewals, as both parties point to earlier contracts, with options to renew, as indicating a continuity of contractual rights.

Where a Bowman contract for 1951, with option to renew for 1952, pre-dates the Players Enterprises contracts, it is clear that the defendant cannot claim prior rights exclusively on the basis of having obtained earlier contracts. But undoubtedly in recognition of this, the defendant has also listed these players among those to whom it claims exclusive rights on the ground that the plaintiff's use of their names, pictures and biographical sketches during 1952, "in knowing violation of defendant's rights and plans to use them *in 1953*," resulted in plaintiff's contracts becoming "illegal" and invalid. (See Middleton affidavit and Schedule B attached thereto.)

In respect to the plaintiff's conduct when signing up players, Miss Crosby testified that generally speaking she did not ask players whether they already had signed with Players Enterprises when obtaining their signatures to Bowman contracts. She stated that she knew Players Enterprises was also signing players, but didn't know for what purpose it was doing so. Moreover, according to Miss Crosby, she felt no need to ask because she was exercising the plaintiff's options to renew, contained in earlier contracts with the players. Apparently she also assumed that any player with prior conflicting agreements with others would not sign a Bowman contract, since it purported to give an "exclusive" grant.

Whatever may be the significance of this more or less general failure of the plaintiff's agents to ask the players about other

contracts they might already have signed, there remains the fundamental question whether the defendant's use of any of these players in 1951, or in 1952, constituted conduct which would invalidate its contract rights. It has already been determined that the defendant's use of the players' names and pictures was not in every case in "knowing violation" of the plaintiff's prior rights with the specific player in question. However, the defendant has made no better showing that admittedly earlier Bowman contracts for 1951 did not constitute the basis of conflicting prior exclusive rights in the plaintiff. Therefore, the defendant is not entitled to an injunction as to the players in finding No. 36.

The evidence discloses that in respect to the remaining fourteen players, their Old Players Enterprises contracts pre-date their 1951 Bowman contracts. As to these players, the plaintiff points to the fact that its 1950 contracts were executed earlier than the Old Players Enterprises contracts.

In referring to its 1950 contracts, the plaintiff contends that defendant's use of the players in 1951 or 1952 was an "illegal" interference with the rights under these earlier Bowman contracts. There is substance to the interference argument in the cases of players whose 1951 Bowman contracts pre-date the Players Enterprises contracts. The argument lacks merit, however, when the 1950 Bowman contracts are made the reference point for alleged tortious conduct on the defendant's part. As already noted, the defendant's use of players' names and pictures in 1951 with its candy product cannot be regarded as an interference with the plaintiff's 1950 contracts, even though these contracts included an option to renew for 1951. The option, of course, is no broader than the terms of the grant, and the grant covered gum and not candy. As to the defendant's use in 1952, the Bowman contracts for 1950 did not extend beyond 1951.

The question arises, however, whether the fact that Players Enterprises solicited its contracts in 1950 was in itself such conduct as would constitute a violation of plaintiff's prior rights, even though the defendant regarded its exercise of the rights thereunder as not including the use of the players' names and pictures with gum in 1951. The mere fact that the Old Players Enterprises contracts were executed while plaintiff's rights were still in full force and effect would not necessarily constitute a violation. The Court of Appeals has made this clear in its supplemental decision. However, what is particularly pertinent in respect to the question raised is the provision in the Old Players Enterprises contracts that the player will not renew any contracts which he might then have with others. In effect, Players Enterprises is inducing the players to stop future dealings with competitors who had obtained exclusive grants before Players Enterprises had entered the picture. The right of Players Enterprises to indulge in such conduct would be governed by such factors as whether the conduct interfered with existing contracts or merely with the prospect of entering into future contracts. In the situation presented here, this in turn would depend, among other things, upon whether the option in the Bowman contracts for 1950 to renew "on the same terms" can be construed as including an option to renew for an additional year in the exclusive grant for 1951 which the grantee could renew under the option.

The plaintiff is not, however, making any contentions along these lines, but is relying on "illegal" use as its ground of opposition. Therefore, since use on the basis of the Old Players Enterprises contracts cannot be regarded as an interference with the earlier 1950 Bowman contracts, and since the Old Players Enterprises contracts pre-date subsequent Bowman contracts, the defendant is entitled to an injunction as to players listed in finding No. 35.

The defendant claims the right to enjoin the plaintiff's use in 1953 of another group of players on the ground that the plaintiff used their names and pictures in 1952 "in knowing violation" of existing prior rights in the defendant as to each of the players. There is some duplication of names as the defendant has included the names of the players as to whom it asserts exclusive rights for 1953 in this sec-

ond group. Those players listed in this group as to whom either or both parties claim exclusive rights for 1953, and ensuing years, have already been considered. Any remaining players as to whom neither party claims exclusive rights for 1953 need not be considered on this hearing. The fact that the defendant may have a non-exclusive contract with a player for 1953 may entitle it to use the player's name and picture, but does not enable it to bar others from also using the player. Past interference with earlier rights may constitute tortious conduct. In the absence of the right to exclusive use in 1953 of the player or players concerned, however, such conduct would serve only as a basis for damages. As noted earlier, the question of damages is not now in issue on the motions under advisement.

The Court of Appeals suggested that "the trial judge in his discretion * * * may deem it wise to issue a series of temporary injunctions, i. e., to enjoin the use by one party of a particular player's picture as and when the exclusive right of the other party to the use of such picture is established by the evidence."

The defendant contends that an injunction in plaintiff's favor will result in damage to the defendant far outweighing any benefit the plaintiff would obtain. This argument is based on Shorin's testimony that the cost of the labor involved in removing a few cards by hand would exceed the total value of the uncut sheets of players' pictures. He testified that the only way to remove the cards would be to cut them out of the uncut sheets by hand.

■ An award of a temporary injunction is "a matter of sound judicial discretion, in the exercise of which the court balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction." Yakus v. United States, 321 U.S. 414, 440, 64 S.Ct. 660, 675, 88 L.Ed. 834. See also McCann v. Chasm Power Co., 211 N.Y. 301, 305, 105 N.E. 416.

Shorin testified that the large sheets containing the pictures of players in defendant's series of cards are put into a machine that automatically cuts the sheets, first into strips and then cross cuts them into individual cards, and then collates all the different cards, one on top of another, to make up a continuous series of cards. The cards are then fed into another machine in stacks, and they are wrapped automatically into packages containing six cards and a stick of gum.

It would seem that this process does not rule out the possibility of removing the cards of players after they are cut and collated, but before being fed into the wrapping machine. For example, the pictures of players to be removed could be marked in some manner on the uncut sheets so as to make them easily identifiable. Then the marked cards could be removed as the cards are being stacked for feeding into the wrapping machine. This would, of course, mean additional cost in operation, but certainly considerably less than the alleged high cost of manually cutting out each card from the large uncut sheets, which procedure Shorin seems to suggest as the only one possible.

The removal of any player from one of defendant's series would mean that the series would no longer be complete as planned by the defendant. However, that fact is not in itself an adequate ground for denying the temporary injunction.

The removal of cards in the process of assembly by some such method as the one suggested would not solve the problem with respect to already wrapped packages now in the defendant's stock room. Requiring the defendant to eliminate players' pictures in such circumstances would probably constitute a hardship.

Therefore, temporary injunctions will be granted as to the players as indicated herein on the following conditions:

1. In respect to proposed series of players for future distribution, the plaintiff or the defendant will be required to remove the cards of those players it is enjoined from using before making up such series.

2. In respect to those series already set up for distribution, the plaintiff or defendant will be required to remove the cards of those players it is enjoined from using

from the stacks of cards not yet finally wrapped.

3. As to cards already assembled and packaged, either party "desiring to avoid being enjoined shall give a bond in a substantial amount," as suggested by the Court of Appeals in its supplemental opinion. Appropriate findings of fact and conclusions of law will be filed concurrently with the foregoing opinion.